IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **V.** | : | **CASE NO. 21-MJ-649** |
| | : | |
| | : | |
| **TIM LEVON BOUGHNER** | : | |

**DEFENDANT TIM BOUGHNER'S RESPONSE
TO UNITED STATES' MOTION IN SUPPORT OF PRETRIAL DETENTION**

Defendant, Tim Levon Boughner, through undersigned counsel, responds to the government's *Motion in Support of Pretrial Detention,* ECF No. 9. For the following reasons the government's motion for detention should be denied and Mr. Boughner should be released subject to conditions ordered by this Court.

Mr. Boughner stands before this Court presumed innocent of all charges alleged by the government. By moving for detention, the government is asking this Court to deprive Mr. Boughner of his liberty prior to his trial and prior to any finding of guilt and prior to the imposition of any sentence of incarceration. None of the charges alleged by the government require a mandatory custodial sentence upon conviction and despite the lengthy detention motion filed by the government, there is not a single allegation that Mr. Boughner caused actual physical injury to anyone.

If pre-trial detention is ordered Mr. Boughner, a lifelong Michigan resident, will be moved hundreds of miles from his hometown and held in a jail where he will be subjected to severe risks to his health given that we are in the midst of a global pandemic. If incarcerated, it will be impossible for Mr. Boughner to socially distance. Furthermore, he will be housed in a unit solely populated by individuals charged with crimes arising from January 6. Spending days

and most likely months in such an environment will unquestionably be severely detrimental to Mr. Boughner's mental health.

The government asserts that pre-trial detention is warranted because Mr. Boughner is a flight risk, a danger to the community and a danger to any pretrial services officer who would supervise him if released. The government is wrong. Mr. Boughner will appear for all court hearings in this matter including trial, he will not cause harm to any member of his community, and he certainly will fully cooperate with his pre-trial services officer. It is the norm in these January 6 cases for the defendant to appear for pre-trial hearings by way of video – even when detained at CTF in D.C. – given the safety concerns arising from the pandemic. Mr. Boughner could easily do the same thing from his Michigan residence and safely attend all hearings in this matter by way of video.

The defense proposes that this Court impose the conditions of house arrest with GPS electronic monitoring. The defense also proposes that this Court order drug and alcohol testing and mental health counseling if deemed necessary by pre-trial services. These conditions will ensure that Mr. Boughner will appear for all court proceedings and will not cause harm to anyone in his community. Release subject to these conditions will also help to ensure Mr. Boughner's continued physical health and will prevent any deterioration of his mental health.

I.  **Tim Boughner is Not a Flight Risk.**

Mr. Boughner was born in Mt. Clemens, Michigan on October 7, 1980. Mt. Clemens is a small town in Macomb County, Michigan. Macomb County is a suburb of Detroit located about 40 miles north of the city. Mr. Boughner has lived in Macomb County his entire life save for a period of time when he moved with his family to Florida when he was a young boy. He attended Memphis High School in Memphis, Michigan and since dropping out of high school in

the 12th grade he has worked as stone mason.  His father was a stone mason as was his grandfather.

  Mr. Boughner does not possess a passport and the only time he was ever outside the United States was when he took a 5-day vacation to Cancun in his early twenties.   All of his family ties are in Macomb County.  His dad, John, his mom, Cindy, his brother, Adam and sister, Melissa all live in Macomb County.  Although he has no children, he has a number of nieces and nephews that he loves dearly: Zachary (age 17); Dylan (age 16); Logan (age 12); Nolan (age 11); Lilly (age 8); Alivea (age 6); and Peyton (age 2).  All seven of his nieces and nephews live in Macomb County. If he is released, Tim will live with his parents at their home address (his mother Cindy will provide the specific information at the detention hearing).  This is the family home where Tim grew up.

  Although he was unemployed before his arrest Tim spent many hours each week caring for his sister Melissa's husband, James Evans.  About a year ago Jim suffered a severe head injury while working in an automotive plant.  He was given a less than 50% chance to survive.  Luckily, he survived but he is fully disabled with a metal plate in his head.  For the last year, Tim has voluntarily spent many hours each week at their house caring for Jim, who is homebound, and also watching his nieces and nephews while his sister Melissa is at work.  If released and if allowed as a condition of his release, Tim intends to continue to provide help to his sister and brother-in-law.  Furthermore, his sister Melissa has advised counsel that she will gladly drive Tim to any appointments he may have as part of his release conditions.

  Tim became unemployed at the outset of the pandemic.  Sadly – like many others -- this had a severe financial impact that led to him spending nights in his car.  At the time of his arrest, he was in fact found staying in his car in a parking lot.  Tim knows that if released he will need

to remain with his parents in the family home.

## II. Tim Boughner is Not a Danger to His Community.

In the absence of a concrete, prospective threat to public safety that cannot be mitigated by strict conditions, this Court must apply "the default rule favoring liberty." *See United States v. Cua*, No. CR 21-107 (RDM), 2021 WL 918255, at *8 (D.D.C. Mar. 10, 2021); *see also United States v. Salerno*, 481 U.S. 739, 755 (1987) ("In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.").

To justify detention based on dangerousness, the government must establish by clear and convincing evidence that Mr. Boughner poses a continued "identified and articulable threat to an individual or the community" that cannot be sufficiently mitigated by release conditions. *United States v. Munchel*, 991 F.3d 1273, 1279-80 (D.C. Cir. 2021) (quoting *United States v. Salerno*, 481 U.S. 739, 751 (1987)); *see also id*. at 1280 ("[A] defendant's detention based on dangerousness accords with due process only insofar as the district court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses a concrete, prospective threat to public safety."). That a defendant posed a danger on January 6 does not, standing alone, justify pretrial detention. The Court must find that the defendant "in fact pose[s] a threat of committing violence in the future," now that "the specific circumstances of January 6 have passed." *Id*. at 1284. Furthermore, "[d]etention cannot be based on a finding that defendant is unlikely to comply with conditions of release absent the requisite finding of dangerousness . . .; otherwise, the scope of detention would extend beyond the limits set by Congress." *Id*. at 1283.

The government has not identified a "concrete," "prospective" "identified and articulable threat" of dangerousness necessary to justify Mr. Boughner's preventative detention. *Munchel*,

4

991 F.3d at 1280. Nor has the government specifically asserted any alleged danger outside of the January 6th circumstances. *Id*. at 1284. *Cf. United States v. Tanios*, 856 F. App'x 325, 326 (D.C. Cir. 2021) (unpublished) (holding that "the district court clearly erred in its individualized assessment of [defendant's] dangerousness" where defendant, among other things, has "no ties to any extremist organizations, and no post-January 6 criminal behavior that would otherwise show him to pose a danger to the community within the meaning of the Bail Reform Act."). Because the government has not shown that Mr. Boughner poses a substantial prospective threat to the community or any other person "now that the specific circumstances of January 6 have passed," *Munchel*, 991 F.3d at 1284, the Court should release Mr. Boughner with conditions of supervision. And in considering condition of release, "'[t]he law requires reasonable assurance, but does not demand absolute certainty' that a defendant will comply with release conditions because a stricter regime 'would be only a disguised way of compelling commitment in advance of judgment.'" *Munchel*, 991 F.3d at 1283 (quoting *United States v. Alston*, 420 F.2d 176, 178 (D.C. Cir. 1969)).

The actions of January 6 do not define the type of person Tim Boughner is. As he stands before this Court he is 41 years old. He is a skilled stone mason and has worked in his community for many years at this trade. He has not had a criminal conviction in over 14 years and that conviction was for a misdemeanor that resulted in a sentence of probation – and by all accounts he successfully completed that probation period.

Tim's criminal convictions took place in his late teens and early to mid-twenties. In his mid-twenties Tim recognized that his involvement in the criminal justice system was directly related to his abuse of alcohol and so he quit drinking and has not consumed alcohol in over 13 years.

If released, Tim will abide by any drug or alcohol testing that this Court may deem necessary. In the almost 12 months since January 6, Tim has had no contacts with law enforcement. He has lived a law-abiding life spending his time looking for work and helping to care for his brother-in-law.

Since his arrest, Tim has fully cooperated with law enforcement. He was arrested without incident and made no attempt to resist. He gave his correct name, date of birth and address. He also made a full and honest statement to the authorities describing his actions on January 6.

The evidence in this case will also show that Tim did not travel to Washington prepared to engage in physical violence. He did not travel there with any weapons and on the day in question he was unarmed and not wearing body armor or any other military type garb. The evidence will show he was wearing blue jeans a jacket and had only his cell phone in his hand.

The evidence will show that the can of spray in question was handed to him during the melee by a perfect stranger. The evidence will also show that he was not a member of any supremacy group nor was he a leader or organizer of the January 6 melee. His improper actions on January 6 should be taken in context along with the law-abiding life he has led for the 14 years before that day and for the entire year since that day while he was living freely in the community.

The pepper spray cases cited to and relied upon by the government do not support detention under the facts of this case. *See* Doc. 9 at 27 and n. 3. The court filings show the following:

- *United States v. Brown,* 21-mj-565
  The defendant was a member of the California Patriots – DC Brigade. He appears

to have participated in the assault in the Capitol tunnel. It is in this tunnel melee that the defendant utilized the pepper spray in coordination with the other rioters who were pushing forward. When arrested, Brown was in possession of multiple cans of bear spray, a taser, a machete and receipts for zip ties, bear spray and ammunition. Finally, months after January 6, Brown was filmed standing on a table in the middle of a Costco using a bullhorn to protest COVID-19 restrictions and would not step down until confronted by law enforcement. *See Court's Memorandum and Opinion*, Doc. No. 14.

- *United States v. Daniel Caldwell*, 21-cr-00181-CKK.
  Mr. Caldwell "[w]ore a camouflage hat, camouflage assault pack, and camouflage trousers, yelling and flipping off Officers in the police line shortly before unleashing a mist of pepper spray/mace, while moving his hand from left to right in an attempt to get the entire line of officers. . . . [He] believed he sprayed around 15 officers." *Memorandum in Support of Pretrial Detention* at 3, Doc. No. 13. He "came prepared not just with pepper spray/mace, but also with protective gear to protect his eyes, knowing full well his activities would involve him getting sprayed in returned." *Id.* at 4. "He was at the front of the crowd talking to and flipping off officers, taunting them before deciding to unleash spray on a large group of officers, knowing full well the effect of prolonged spray on the officers who were trying to calm and disperse an angry crowd." *Id.* at 7. After January 6, he "touted his efforts in [a] ProPublica video by proudly stating he threatened the officers for spraying the crowd by returning spray back to them." *Id.* at 8.

- *United States v. Khater*, 21-cr-222
  Mr. Khater "[w]ork[ed] together [a with co-defendant] to assault law enforcement officers with an unknown chemical substance by s*praying multiple officers directly in the face and eyes*. . . [T]he video evidence of th[e] assault shows that the defendants clearly timed the deployment of chemical substances to coincide with other rioters' efforts to forcibly remove the bike rack barriers that were preventing the rioters from moving closer to the Capitol building. *Government's Omnibus Opposition to Defendants' Motions to Release from Custody* at 4, Doc. No. 21 (emphasis added). The Court of Appeals found that "[Khater], without provocation, coolly walked up to police officers and assaulted them, twice, with a chemical spray–one of whom was 'standing there with no gear protecting her face.' The district court determined that the violent assaults appellant committed *disabled at least three officers* and those who had to care for the disabled officers, leaving holes in their protection. In addition, the district court found that appellant contributed to the crowd's ability to breach the police line in front of the Capitol and engaged in some level of prior planning and coordination. The evidence of planning and coordination is corroborated by what [the defendant's] co-defendant said when appellant asked to retrieve bear spray from the co-defendant's backpack: 'hold on, hold on, not yet, not yet ... it's still early.'" *United States v. Khater*, 856 F. App'x 322, 323 (D.C. Cir. 2021) (unpublished) (citations omitted) (emphasis added).

7

- *United States v. Gieswein*, 21-cr-24
  The defendant, marched with the Proud Boys, wearing full tactical gear with goggles.  He was armed with pepper spray in one hand and a baseball bat in the other.  He was one of the very first protesters to enter the capital and utilized the spray on several occasions outside and inside the capital and also threw several punches at the police.  One officer was hit in the eye with the spray and it caused him physical pain.  It was also determined that he held a leadership position in the melee and was seen on video encouraging others to enter the building. *See Government's Opposition to Defendant's Motion for Hearing and Revocation of Detention Order*, Doc. No. 19.



- *United States v. Lazar*, 1:21-cr-00525-ABJ
  Mr. Lazar came to the Capitol "dressed in a camouflaged tactical vest . . . [with] a patch that read, 'Blessed be the Lord, my rock, who trains my hands for war, and my fingers for battle.' At times, the defendant wore green ski goggles to protect his eyes from chemical irritants deployed by law enforcement. . . He "had his face painted in a camouflaged design and carried a [two-way] radio on his tactical vest. . . He also "carried a red and white bullhorn," which he used to encourage others. *Motion for Detention Pending Trial* at 3-5, Document No. 6. He encouraged others' misconduct by approached a line of officers and yelling "forward" through his bullhorn while signaling hundreds of others to charge the police. Then he yelled to other rioters "Let's get their guns! Let's get their guns!"

encouraging others to forcefully take the officers weapons from them. "He was at the front of the crowd that breached police lines on the West Front, repeatedly approaching the line to verbally taunt officers, to pull on the barriers and to encourage others to charge police and take their weapons." *Id.* at 9, 11-12. Mr. Caldwell sprayed pepper spray at officers twice. *Id.* at 6-7.



- *United States v. McHugh*, 21-cr-00453-JDB
  "McHugh was constantly at the front of the rioters, directly confronting police officers. . . He was an active aggressor who consistently used his megaphone to encourage his fellow rioters. In this way, he assumed *a de facto leadership role* in the assault and likely inspired further criminal conduct on the part of others. *Government's Response in Opposition to Defendant's Motion to Review Magistrate Judge's Detention Decision* at 18, Doc. No. 16 (emphasis added). He "encourage[ed] others to engage in disruptive and disorderly conduct, assault[ed] law enforcement officers by encouraging and helping other rioters push a large sign into a line of officers, scuffl[ed] with an officer in an attempt to defeat a barricade, and spray[ed] an unknown chemical into a *line of officers*." *Id.* at 3 (emphasis added). He "was seen gesturing to the crowd to advance on the police while yelling things like 'Come on! Let's go!'; 'Come on you guys, come on you guys! Bring it in!'." *Id.* He "gave the rioters specific instructions as to the large metal sign that he ultimately used to push into police, screaming into his megaphone, 'Yeah bitch! Put it up there! Put it up there!'" *Id.* at 19. And, he "came to D.C. prepared for conflict carrying a 'conventional dangerous weapon' of chemical spray for offensive use, . . . which [he] holstered at his right hip. *Id.* at 7, 17.

- *United States v. Quaglin*, 21-cr-40
  Quaglin caused physical injury to multiple victims. A member of the Proud Boys, *see Government's Memorandum in Support of Pre-Trial Detention* at 22-24, Doc. No. 8, he "shoved and struck multiple police officers outside the Capitol, and he discharged MK-9 OC spray at police officers, including directly into the

9

unprotected face of one officer. Appellant was also on the front line of a group of individuals attempting to violently force their way inside the Capitol by physically overcoming a defensive line of police officers. In the aftermath of the incident, appellant posted videos to social media accounts celebrating his role in the violence." *United States v. Quaglin*, 851 F. App'x 218, 219 (D.C. Cir. 2021) (unpublished).

- *United States v. Schwartz*, 1:21-cr-00178-APM
  Schwartz utilized pepper spray on multiple occasions and also distributed pepper spray cannisters to other individuals during the melee. Defendant Schwartz also participated in the Capitol Building tunnel assault joining a mob of individuals who were pushing their way into the building. This assault resulted in the crushing of an officer in the doorway. Furthermore, at the time of this incident defendant Schwartz was on probation for 4 separate offenses involving assault and firearms offenses and had several outstanding warrants for his arrest. *See Government's Opposition to Defendant's Motion to Set Bond*, Doc. No. 26.

- *United States v. Worrell*, 21-cr-292
  Worrell is "a self-avowed member of the Proud Boys, . . .[who] traveled and coordinated with other members of the Proud Boys in the days and hours leading up to the assault on the U.S. Capitol. When the time came, Worrell surged forward with a crowd of rioters to confront a line of police officers who were attempting to calm and hold back the crowd. Wearing tactical gear and armed with a canister of pepper spray gel marketed as 67 times more powerful than hot sauce, Worrell advanced, shielded himself behind a wooden platform and other protestors, and discharged the gel at the line of officers. Mere minutes later, the line of officers was breached, and a surge of rioters entered the seat of this Nation's Legislative branch." *Memorandum in Support of Motion for Review of Release Order* at 1, Doc. No. 9. *Accord Order of Detention Pending Trial*, Doc. No. 13. He "'traveled to the nation's capital equipped with tactical gear in preparation conflict with law enforcement," including a tactical vest, communications equipment, and pepper spray gel, . . . 'coordinated with members of the Proud Boys and others to come to Washington, D.C., to march on the Capitol, and to impede law enforcement at every turn once on the Capitol grounds,' and violently assaulted a line of law enforcement officers . . . and issued a vague threat about a potential witness." Doc. No. 9 at 2.

Additionally, the government failed to advise the Court that numerous January 6 defendants charged with assault on a federal law enforcement officer with a dangerous weapon like Mr. Boughner have been released with special conditions, including:

- *United States v. Blair*, 21-cr-186-CRC
  Blair was captured on body worn camera brandishing a lacrosse stick that served as a pole for a large Confederate flag. *See Complaint and Statement of Facts* at 2-

    3, Doc. No. 1-1. While walking back and forth between the crowd and police officers, Blair is alleged to have exhorted, "hell naw, quit backing up, don't be scared. . .". As an officer advanced, Blair yelled at the officer: "what's up motherfucker, what's up, what's up bitch." *Id.* at 3. He then struck the officer in the chest with the lacrosse stick and had to be forcibly restrained by multiple officers. *Id.* at 4. Notwithstanding this direct physical assault with a lacrosse stick, Blair was ordered released with conditions. *See* Doc. No. 6.

- *United States v. Coffee*, 21-MJ-236
"Coffee used a crutch to attack law enforcement officers as they guarded a Lower Terrace entrance to the U.S. Capitol during the insurrection on January 6, 2021. Coffee's assault, captured on video, included charging at these United States Capitol Police and Metropolitan Police Department Officers using the crutch and, in at least one instance, using the crutch in an attempt to strike the upper chest/head area of one of the officers." *Motion for Emergency Stay and for Review of Release Order*, Doc. No. 5. "[A]fter the initial charge at the officers, Coffee came at them again, this time holding the crutch more aggressively by positioning it towards an officer's upper chest and head area." *Supplemental Memorandum in Support of Pre-Trial Detention* at 3, Doc. No. 14. The government contended that "Coffee intended to further use the crutch as blunt object weapon by positioning the crutch directly toward the officer's upper chest/head area; two MPD officers had to hold back Coffee." *Complaint and Statement of Facts* at 16, Doc. No. 1-1. Coffee was ordered released with conditions. *See Order Setting Conditions of Release*, Doc. No. 18.

- *United States v. Foy*, 1:21-cr-108-TSC
"[U]nlike many other participants in the events of January 6, Foy is alleged to have both engaged in a physical attack on law enforcement officers and to have breached the Capitol building itself." *Memorandum Opinion* at 6–7, Doc. 44. "On November 6, 2020, defendant Foy joined a mass demonstration with others at the TCF Center in Detroit, Michigan, to protest the recent 2020 Presidential Election results in Michigan where workers were inside counting absentee ballots." *Government's Opposition to Defendant's Emergency Bond Review Motion* at 18, ECF No. 11. On January 6, 2021, "Foy willfully and deliberately brought a hockey stick - a deadly weapon, with him and used that weapon to repeatedly strike law enforcement officers in the face, head, neck, and body area. Additionally, based on a review on the relevant photos and videos of defendant Foy, he is seen encouraging other rioters to assault to officers as well to join him when he crawled through a destroyed window and into the Capitol of the United States, weapon in hand." *Government's Opposition to Defendant's Emergency Bond Review Motion* at 4, ECF No. 11. "Foy violently attacked officers while attempting to break through the center doorway on the Lower West Terrace to gain entrance to the U.S. Capitol Building. He used physical violence against officers who were protecting the entrance." *Id.* at 5. "Defendant Foy violently used his hockey stick to attack officers to cause harm to them and to hurt them with each blow he inflicted. His violent assault on the officers was persistent and

11

unrelenting. In the videos capturing his actions, defendant Foy willfully struck law enforcement officers again and again in an effort the harm them. Moreover, defendant Foy's conduct did not stop at his own individual decision to engage in physical violence. It extended to his active encouragement of other rioters to continue to try to break through the police line and into the building." *Id.* at 15. "Foy [was seen on video footage] throwing a projectile and aggressively and repeatedly swinging a hockey stick towards law enforcement officers positioned outside of the center doorway of the Lower West Terrace of the U.S. Capitol." *Memorandum Opinion* at 2-3, ECF No. 44. "Shortly after the attack on the police officer, [Foy was seen] motioning his arms, seemingly urging other protesters forward, and ultimately climbing through a window into the U.S. Capitol, hockey stick in hand." *Id.* at 3. The District Court released Mr. Foy with various conditions. *See* Doc. Nos. 44, 47.

- *United States v. Chad Jones*, 21-mj-076
  Jones is charged with assault on a police officer with the use of a deadly or dangerous weapon (a flagpole) and is accused of repeatedly striking and breaking the glass of the doorway where Ashli Babbitt was shot and killed. *See Complaint and Statement of Facts*, Doc. 1-1. The government did not seek detention and the Court released Jones with conditions. *See Order Setting Conditions of Release*, Doc. No. 8.

- *United States v. Gossjankowski*, 21-CR-123, ECF No. 41
  Mr. Gossjankowski activated a TASER multiple times, as evidenced by light flashes emanating from the TASER's tip; and pushing himself through the crowd of violent individuals towards the police line that was protecting the entrance to the U.S. Capitol building. *See Complaint and Statement of Facts* at 2, Doc. 1-1. The government did not seek detention.

- *United States v. Klein*, 21-CR-236
  Klein actively tried to enter the Capitol through the Lower West Terrace doorway. While inside the tunnel for over 30 minutes, Klein repeatedly placed himself at the front of the mob and used force against several officers to try to breach the Capitol entrance. *Complaint and Statement of Facts* at 5-10, Doc. No. 1-1. He ignored several verbal commands by officers to "back up" and "[l]et it go now." *Id*. at 6. And twice he can be heard calling to the crowd behind him: "We need fresh people, we need fresh people." *Id*. at 8. Around 2:55 p.m., Klein bent down to pick up a flagpole, which lay at the foot of the police line, and passed it back to other rioters. Klein came into the possession of a plastic riot shield, which had been taken from the police. Body-worn camera footage from the Metropolitan Police Department captures Klein and another unidentified individual wedging the shield between the doors to the Capitol at approximately 3:00 p.m. in an apparent effort to prevent the officers from closing the doors. At 3:15 p.m., another BWC video shows Klein pushing the shield into an officer's body in an attempt to break the police line. *Id.* at 7. A publicly sourced video posted to YouTube also depicts Klein shoving the shield against an unidentified officer's

12

body and against the shields of two MPD officers.

- *United States v. Miller*, 21-cr-75
  Charged with assault on law enforcement for discharging a fire extinguisher upon the steps leading to an entrance to the U.S. Capitol building. *United States' Memorandum in Support of Pretrial Detention* at 4, Doc. 13; Indictment, Doc. 10. "The defendant self-identifies as a member of the "Patriotic American Cowboys" and donned a flag, known as the Gadsden Flag, during the riots at the U.S. Capitol on January 6, 2021. . . [T]he Gadsden Flag has more recently become a symbol for the Tea Party, Second Amendment advocates, and organizations opposing government overreach." *Id.* at 10. The Court released him with conditions. *See* Doc. No. 22.

- *United States v. Clayton Ray Mullins*, 21-cr-35-EGS
  Mullins was captured on publicly available video and body worn camera pulling an officer into the crowd of rioters, away from a group of officers defending the Capitol. *See* Complaint and Statement of Facts, Doc. No. 1-1. Mullins was released on conditions. *See* Doc. No. 11.

- *United States v. Owens*, 21-CR-286
  "[A]s officers were making their way to the aid of other officers, [Owens] nonetheless violently" "smacked an officer in the head with a skateboard, seemingly for no real reason, and impeded the entire group's ability to do its job and help other law enforcement officers. [The] Officer [] suffered a head injury." *Government's Response to Defendant's Motion for Revocation of Detention Order Pursuant to 18 U.S.C. § 3145(B)* at 9, Doc. No. 14; *accord* Transcript of Detention Hearing at 5, Doc. No. 14-1. Owens was released on conditions. *See Order* Doc. 14.

- *United States v. Robert Sanford*, 21-cr-86
  Sanford hurled a fire extinguisher into a crowd of police officers and striking at least three officers in the head. Video footage allegedly captures Sanford screaming "traitors" and "cowards" at the officers. *See Government's Opposition to Defendant's Motion to Reconsider Detention*, Doc. No. 10. The District Judge granted Sanford's motion for release and placed him on GPS monitoring. *See* Doc. No. 11.

- *United States v. Stevens,* 21-cr-198
  Stevens was charged with multiple counts of assault including with a deadly weapon – a police shield.  The government agreed to his release subject to the condition of location monitoring. *See Order Setting Conditions of Release*, Doc. No. 9.

### III. Mr. Boughner's Physical and Mental Health Will be Placed at Risk If he is Detained.

There can be little doubt that Mr. Boughner will be safer on home detention than in confinement at the CTF in Washington D.C. or any other prison facility. If he is permitted to stay in his home, he can socially distance, he can attend court hearings by video and he can receive drug/alcohol and mental health counseling if deemed necessary by the Court. If on the other hand he is incarcerated he will be placed in a setting that will create a significant risk of him contracting COVID 19. And he will most likely be housed among individuals that will promote ideas that could lead to radicalization.

As of December 17, 2021, 41,773 inmates in the custody of the Federal Bureau of Prisons have contracted and recovered from COVID-19, as have 8,632 BOP staff. Two hundred and seventy-three inmates and seven staff members have died from the virus. Currently, at least 286 federal inmates and 240 BOP staff are confirmed to be infected with COVID-19. Federal Bureau of Prisons, *COVID-19 – Coronavirus*, https://www.bop.gov/coronavirus/ (last visited Dec. 20, 2021).

This most recent COVID outbreak is not limited to the BOP. The local jails in Washington, D.C. are also struggling to contain a serious COVID outbreak. On Saturday, December 18, 2021, General Counsel of the D.C. Jail advised Chief Judge Howell in an email that "today 29 residents tested positive for COVID-19, and currently, there are 39 COVID-19 positive residents at DOC." Clearly, detaining Mr. Boughner will place him in great danger of contracting the virus.

It is also a fact that most of the detained January 6 defendants are being housed in the same unit in the CTF in Washington D.C. ("the patriot wing"). If Mr. Boughner – who is not a

14

member of any political extremist group or supremacy group -- is placed in that unit he will be subjected to intense peer pressure and group thought.  This environment will have an undoubtedly negative impact on Mr. Boughner's current mental health and could result in extremist thoughts.  Placing Tim in this environment will most certainly exacerbate his situation. *See* Tess Owen, *Capitol Rioters in Jail's 'Patriot Wing' Have Their Own Rituals And A Growing Fan Base*, October 21, 2021**,** https://www.vice.com/en/article/akvwjp/january-6-rioters-jailed-together-forming-rituals-fanbase (last visited Dec. 20, 2021).

### IV.    Conclusion

Tim Boughner is presumed innocent of the charges that have been brought against him.  In its lengthy detention motion the government does not allege that he caused actual injury to anyone.  For the past 12 months since January 6, Tim has lived in his community without any supervision and has caused no harm to anyone.  There is no question that if he is placed on house arrest with GPS electronic monitoring he can live safely and address the charges that have been brought against him.  The government has not met its burden and release subject to conditions should be granted.

                    Respectfully submitted,

                    /s/ James J. McHugh, Jr.
                    James J. McHugh, Jr., #48308PA
                    Hunter Labovitz, #204760PA
                    Federal Community Defender for the
                    Eastern District of Pennsylvania
                    601 Walnut Street, Suite 540W
                    Philadelphia, PA 19106
                    (215) 928-1100
                    james_mchugh@fd.org
                    hunter_labovitz@fd.org

**CERTIFICATE OF SERVICE**

I, James J. McHugh, Jr, Assistant Federal Defender, Federal Community Defender Office for the Eastern District of Pennsylvania, hereby certify that on this 20th date of December 2021, I have filed and served a copy of Defendant's Response to United States' Motion in Support of Pretrial Detention through the District of Columbia Clerk's Office Electronic Case Filing ("ECF") and/or by electronic mail upon:

Mitra Jafary-Hariri
Assistant United States Attorney, Detailee
211 W. Fort Street, Suite 2001
Detroit, MI 48226

/s/ James J. McHugh, Jr.
JAMES J. McHUGH, JR
Assistant Federal Defender